IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LALONI KAY CHRISTENSON,<br><br>      Plaintiff,<br><br>   v.<br><br>FLTI, an Arkansas non-profit corporation, doing business as FAMILY LIFE PUBLISHING; CAMPUS CRUSADE FOR CHRIST, INC., a California non-profit corporation,<br><br>      Defendants. | Case No. 6:13-cv-00254-AA<br>OPINION AND ORDER |

Daniel J. Rice
Heltzel, Williams, Yandell, Roth, Smith, Petersen & Lush, P.C.
117 Commercial Street N.E. #400
P.O. Box 1048
Salem, Oregon 97308
    Attorney for plaintiff

Duane A. Bosworth, II
Timothy M. Cunningham
Davis, Wright, Tremaine, L.L.P.
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201
    Attorneys for defendants

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Defendants FLTI, doing business as Family Tree Publishing, and Campus Crusade for Christ, Inc. move to dismiss plaintiff Laloni Kay Christenson's copyright infringement claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, defendants' motion is granted and this case is dismissed.

## BACKGROUND

In 2003, plaintiff authored a manuscript, "Christ in Christmas: An interactive Christmas devotional for the whole family" ("CIC"), and thereafter registered and deposited the work for protection with the United States Copyright Office. Plaintiff's manuscript focuses on the characters from the Nativity scene and is designed for parents to engage their children in different devotional exercises in the days leading up to Christmas.

After registering CIC for copyright protection, plaintiff submitted a manuscript to defendants for potential publication. Approximately one week later, defendants rejected plaintiff's submission but did not return her manuscript. In 2005, defendants published a children's book entitled "What God Wants for Christmas" ("WGWC"). Like CIC, WGWC is an interactive work that conveys to children the meaning and significance of the Nativity story. In 2006, defendants published the second edition of WGWC, which is substantively identical to the prior version. In 2007, plaintiff first learned of WGWC after her daughter purchased a copy while

attending an event sponsored by defendants. Defendants continue to publish and circulate WGWC.

On February 13, 2013, plaintiff initiated an action in this Court. On May 30, 2013, with defendants' written consent pursuant to Fed. R. Civ. P. 15, plaintiff filed a first amended complaint ("FAC"), alleging that WGWC and CIC are substantially similar in the following respects:

> (1) concept and feel: "[t]he concept of both works is to guide readers through an activity in which family members open a different small gift box filled with a nativity scene character and then read and discuss the corresponding text for each character . . . Both works are filled with questions about each of the characters and citations to scriptures to learn more information. The instructions for how to complete the exercises are substantially similar. Both works set forth suggested alternate uses, including a scavenger hunt, and encourage readers to be imaginative in how they use the work."
>
> (2) theme and message: "[t]he theme and message of both works center on guiding children to giving their lives to Jesus as a Christmas gift. Both works communicate that theme and message in the same manner by using the last exercise in the book to introduce the message. Both works then transition into a section on how adults can help children dedicate their lives to Christ."
>
> (3) sequence, organization, and pace: "[b]oth works begin with an explanation of how to use the book and the goals of the family exercises, the characters are then presented in substantially the same order, and both books end by offering guidance on leading a child to Christ."

FAC ¶ 10. On June 19, 2013, defendants moved to dismiss the FAC because the parties' respective works are not substantially similar as a matter of law.

Page 3 - OPINION AND ORDER

## STANDARD OF REVIEW

Where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). For purposes of a motion to dismiss, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir. 1983). However, bare assertions that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." Ashcroft v. Iqbal, 556 U.S. 662, 680-81 (2009). Rather, to state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. Starr v. Bacca, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. denied, 132 S.Ct. 2101 (2012).

In the context of a claim for copyright infringement, the court considers and compares the works themselves if they are incorporated by reference into the complaint or attached thereto. See Erickson v. Blake, 839 F.Supp.2d 1132, 1135 (D.Or. 2012) (citing Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001)); see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) ("[i]n copyright infringement actions, the works themselves supersede and control contrary descriptions of

Page 4 - OPINION AND ORDER

them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings") (citations and internal quotations omitted).

## DISCUSSION

To state a claim for copyright infringement, the plaintiff must allege: (1) ownership of a valid copyright; (2) defendant's access to the copyrighted work; and (3) substantial similarity between the copyrighted work and defendant's work. Olson v. Tenney, 466 F.Supp.2d 1230, 1235 (D.Or. 2006) (citing Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir. 1984), cert. denied, 470 U.S. 1052 (1985)). "For the purposes of this motion, only, defendants do not contest that plaintiff owns the copyright in question or that plaintiff has alleged facts sufficient to establish that defendants had access to the copyrighted work." Defs.' Mem. in Supp. of Mot. Dismiss 2. Accordingly, this case hinges on whether the parties' respective works are substantively similar.

To determine substantial similarity, the court engages in a two-part inquiry: "the allegedly infringing work [must be] both objectively similar (the 'extrinsic test') and subjectively similar (the 'intrinsic test') to the copyrighted work." Erickson, 839 F.Supp.2d at 1135 (citation omitted). The court first applies the extrinsic test, which is an objective measure of whether the two works share "articulable similarities between the plot, themes,

Page 5 - OPINION AND ORDER

dialogue, mood, setting, pace, characters, and sequence of events." Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1077 (9th Cir. 2006) (citation and internal quotations omitted); see also Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994) ("[w]hen applying the extrinsic test, the court must analytically dissect the works to evaluate any similarities on an element-by-element basis"). Whether works are substantially similar under the extrinsic test is a question of law to be determined by the court. Erickson, 839 F.Supp.2d at 1135 (citation omitted).

If the extrinsic test reveals "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events," the court then moves onto the intrinsic test. Funky Films, 462 F.3d at 1077. "[T]he intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." Id.

Three additional concepts interact with this analytical framework. First, "it is axiomatic that a copyright only protects expression, not the idea behind the expression." Erickson, 839 F.Supp.2d at 1136 (citing 17 U.S.C. § 102(b)). Thus, "to the extent the similarities between plaintiff's and defendant's works are confined to ideas[,] general concepts, [or other nonprotectible elements,] these similarities are noninfringing." Data E. USA,

Inc. v. Epyx, Inc., 862 F.2d 204, 208 (9th Cir. 1988); see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) ("[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected . . . copyright protection may extend only to those components of a work that are original to the author"). As such, in applying the extrinsic test, "only those elements of a work that are protectable . . . can be compared." Apple Computer, 35 F.3d at 1443.

"Unprotected elements of a copyrighted work can include (1) ideas, as opposed to expression; (2) expressions that are indistinguishable from the underlying ideas; (3) standard or stock elements (scènes à faire); and (4) facts and other public information." Erickson, 839 F.Supp.2d at 1136. Once the unprotected elements are ""filter[ed] out and disregard[ed]," the court considers the scope of the copyright. Funky Films, 462 F.2d at 1077; Apple Computer, 35 F.3d at 1443. "If few similarities remain after the unprotected elements are set aside (e.g., facts, ideas, expressions merged with ideas, and scènes à faire), the scope of the copyright is 'thin,' which means that it only protects the copyrighted work from virtually identical copying." Erickson, 839 F.Supp.2d at 1138 (citations omitted). Conversely, "[i]f many of the similarities relate to protected elements, . . . then the scope of the copyright is 'broad,' and it is easier to demonstrate that the two works, compared as a whole, are substantially

Page 7 - OPINION AND ORDER

similar." Id. (citation omitted).

Second, and closely related, is the doctrine of merger. "If a non-protectable idea can only be expressed in one way, the resulting expression will also not be protected by copyright; otherwise, the holder of the copyright for that expression would effectively have a copyright over the underlying idea." Id. at 1137 (citation omitted). Third, facts or matters within the public domain, such as Biblical stories, are not copyrightable. See Feist, 499 U.S. at 363; see also Douglas v. Osteen, 560 F.Supp.2d 362, 367 (E.D.Pa. 2008), aff'd, 317 Fed.Appx. 97 (3rd Cir. 2009) ("[p]laintiff may not claim a copyright in biblical stories, which are in the public domain"). "[T]he scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of the facts and theories already in the public domain." Olson, 466 F. Supp. at 1236 (citation omitted) (emphasis added).

I.  Description of "Christ in Christmas"

CIC is a straightforward and instructional work that explores the Nativity story in an expository and didactical manner. See FAC Ex. A. It begins with a section, "The History of 'Christ in Christmas,'" which recounts plaintiff's personal story in developing her work. Id. at 10.[1] The next section provides one

---

[1] Because plaintiff did not numeralize the exhibits to her complaint, the Court refers to the page numbers assigned in the docket.

Page 8 - OPINION AND ORDER

page of directions that instruct the reader to "[w]rap each nativity piece in Christmas wrapping paper" and then open and discuss one box per day. Id. at 11.

The following six sections are the substance of CIC; each relays a story about a character central to the Nativity story, including the angels, Mary, Joseph, the shepherds, the wise men, and baby Jesus, respectively. Id. at 12-22. These sections contain very few spoken statements and no dialogue, and are written in the third person. Id. Each story is followed by a list of four questions and citations to scriptures pertaining to the Nativity story. Id. at 13-23. Of the 24 questions posed, 20 are confined to asking a child to repeat what he or she has heard in the story just read, while four questions call for reflection. Id.

Plaintiff's work concludes with three final sections, each one page in length. Id. at 24-26. The first, "Steps to Give Your Life to Christ," consists of quoted scripture and delineates three steps associated with that scripture, titled "Accept," "Believe" and "Confess." Id. at 24. The second provides further instructions regarding "[h]ow . . . the six-day devotional 'Christ in Christmas' works"; it is reiterative of the initial directions. Id. at 25. The final section briefly describes suggested variations, such as hiding the nativity pieces and "us[ing] a treasure hunt method to find them," or "[t]ailor[ing] the stories to [each] family's ages and needs." Id. at 26.

Page 9 - OPINION AND ORDER

Physically, plaintiff's manuscript is presented on eight-and-one-half inch by eleven inch pages, oriented horizontally; it appears to be drafted in either Times New Roman regular or bold font and designed on a home computer, with thick borders around the images that generally follow pages containing solely text. See, e.g., id. at 22-23. The title of each of the six interior sections is only slightly larger than the body text and uniformly appears centered at the top of the page.

II. Description of "What God Wants for Christmas"

WGWC starts with a table of contents, followed by "Suggestions for Using What God Wants for Christmas," which consists of detailed subsections addressing the contents of the manger, instructions, using the work with children of various ages, and alternate uses ("Classroom Experience," "Evalgelistic Outreach," "Scavenger Hunt," and "Plays, Dramatic Reading, and Creative Play"). Id. at 29-37. The instructions direct that "there are two basic ways to use" defendants' work: a family can read through the entire story, opening all seven boxes "in one sitting," which "will probably take 20 to 30 minutes" or, alternatively, a family "may go through one of the story's parts each day for seven days—consecutively or intermittently as your schedule allows." Id. at 33.

The next seven sections are paramount. The first six recount Nativity character stories in the following order: Gabriel, Mary, Joseph, baby Jesus, the shepherd, and the wise man. The seventh

section is entitled "What God Wants" and instructs the reader that "God wants . . . you" for Christmas; it is accompanied by a mirror rather than a figure from the Nativity scene. Id. at 38-52. Each story is narrated by the angel Gabriel in the first person, relayed via a short poem of "AABB" rhyming quatrains and concluding with a constant, repeated phrase. In addition, each poem contains frequent dialogue and a playful tone. A continuous meandering line, emanating on the first page from Gabriel's trumpet, leads to the single question and scripture associated with each poem. See, e.g., id. at 40-41. Each of the seven questions are open-ended and neither the questions nor the scripture cited for reference refer to the Nativity story.

The final sections of defendants' work provide input on how adults can help lead children to Christ. Included therein are "Tips for Grown-Ups," which encourage adults to "Pray," "Trust God," Be an Example," "Listen," "Keep it Simple," "Ask Questions," and "Take Time." Id. at 53-58. The last page contains a list of "other resources [for] growing a relationship with God." Id. at 59.

WGWC is approximately eight inches by six inches when closed, oriented horizontally, and is drafted in a whimsical font that remains consistent throughout the work. The title of each segment is in a substantially larger font than the body text and appears at different places on the page, depending on the accompanying image,

which are integrated into the work. See, e.g., id. at 42-43. Several segments contain multiple images. Id. Each of the central seven stories are two pages in length, except for the story of the infant Jesus, which spans four pages.

III. Analysis

Defendants contend that plaintiff's copyright infringement claim fails because CIC and WGWC are not substantially similar, as evinced by the fact that plaintiff "does not identify any particular expression" that is protectible. Defs.' Reply to Mot. Dismiss 2. To the extent there are similarities between the parties' works, defendants assert that they are "nearly wholly unprotected by copyright law"; once the "unprotectable matter has been stripped away . . . it would require virtually identical copying in order to be actionable," which is not present here. Defs.' Mem. in Supp. of Mot. Dismiss 1-2 (internal quotations and emphasis omitted).

Plaintiff concedes that neither the Nativity story nor the characters discussed therein are protectible. See Pl.'s Resp. to Mot. Dismiss 6-7. Plaintiff also acknowledges that, individually, "the nativity scene characters, the family centered exercises centered on unwrapping gift boxes with figurines of the characters, the message of giving one's life to Christ as a Christmas gift, etc. - are too generalized to warrant copyright protection." Id. at 9-10. Plaintiff argues, however, that the "particular

Page 12 - OPINION AND ORDER

combination and mode of expressing all of these elements in her work does merit protection." Id. at 7-10 (citing Metcalf v. Bochno, 294 F.3d 1069 (9th Cir. 2002)). Plaintiff further asserts that the "total concept and feel," the "theme and message," and "the sequence, organization, and pace" of the works are substantially similar, such that dismissal is inappropriate. Id. at 12; see also FAC ¶ 10. Moreover, according to plaintiff, the "overall concept and feel of the works is the most important factor" in evaluating the similarity of children's books. Pl.'s Resp. to Mot. Dismiss 10-16 (citing Cavalier v. Random House, Inc., 297 F.3d 815 (9th Cir. 2002)).

Initially, the Court notes that plaintiff's argument in opposition to dismissal conflates the extrinsic and intrinsic tests. Essentially, plaintiff's position is that the overall concept and feel are dispositive where, as here, nonprotectible elements in a children's book are strung together in a unique and particular sequence. See id. at 6-13. At this stage in the proceedings, however, the Court "cannot . . . gauge the overall feel of similarity between the two works; that is the purpose of the intrinsic test, which is generally reserved for the jury." Erickson, 839 F.Supp.2d at 1136 n.4.[2]

---

[2] Thus, to meet the extrinsic test, plaintiff must do more than assert that defendants "express[ion of] subjects and ideas" is substantially similar. Pl.'s Resp. to Mot. Dismiss 7; see also FAC ¶ 10.

Page 13 - OPINION AND ORDER

Cavalier does not modify this well-established rule. In Cavalier, the court accurately described the extrinsic test, which did not include consideration of the total concept and feel, before finding that the extrinsic test did "not justify a finding of substantial similarity." Cavalier, 297 F.3d at 822-25. The court noted "further" that an analysis of the total concept and feel would also show no infringement. Id. at 825. In adding this dicta, the court quoted Williams v. Crichton, 84 F.3d 581 (2d Cir. 1996), for the proposition that "consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works." Id. Williams, however, is an out-of-circuit decision that did not employ the extrinsic/intrinsic test. See Williams, 84 F.3d at 587-89. As such, neither Cavalier nor Williams can be read to alter the Ninth Circuit's two-part inquiry, even where children's books are at issue. See, e.g., Funky Films, 426 F.3d at 1076.

Metcalf is also distinguishable. In Metcalf, the court held that, pursuant to the extrinsic test, the patterns of otherwise unprotectible plot elements could create protectible expression:

> [t]he similarities between the relevant works are striking: Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose

Page 14 - OPINION AND ORDER

> between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician. The totality of the similarities goes beyond the necessities of the theme and belies any claim of literary accident.

Metcalf, 294 F.3d at 1073-74 (citation and internal quotations, brackets, and ellipses omitted). The holding in Metcalf is therefore limited to the plot of a literary, fictional work.

Here, it is undisputed that the plot is stock; both parties "use the story of the Nativity to tell the story of the Nativity." Defs.' Reply to Mot. Dismiss 7-8; Pl.'s Resp. to Mot. Dismiss 10. Instead, the similarities alleged by plaintiff arise from non-plot elements, including sequencing, instructions, questions, gifts, variations, and how to lead someone to God. See Pl.'s Resp. to Mot. Dismiss 12-13; see also FAC ¶ 10. Yet nothing in Metcalf allows a finding of substantial similarity based on the organization of these non-plot elements. See Metcalf, 294 F.3d at 1073-74. Thus, Metcalf is not persuasive authority in this context.

With these issues resolved, the Court now turns to setting aside the nonprotectible elements of plaintiff's work. It is

Page 15 - OPINION AND ORDER

undisputed that the following elements are not protected under copyright law: (1) the Nativity story and characters; (2) asking questions about Biblical characters and providing scripture to allow for more in-depth exploration of those characters; (3) the theme and message of giving one's self to God or Jesus, even as a Christmas present; and (4) the concept of family exercises centered on unwrapping gift boxes with figurines. See Pl.'s Resp. to Mot. Dismiss 6-7, 9-10; see also Anthony Smith, "What Do you Give God For Christmas?," http://www.christian-momies.com/special-features/bible-studies/what-do-you-give-god-for-christmas/ ("[t]he best present that you can give God this Christmas, is yourself, and your family"); Encyclopedia Britannica, "Christmas," http://www.britannica.com/EBchekced/topic/115686/Christmas (tradition of using an Advent calendar, in which one small gift was revealed each day leading up to Christmas, was developed during the 19th century).

Further, the structure of the work merges with the unprotectible ideas and subject-matter addressed therein. In order to flow logically, both works must first describe themselves and how they can be used with children before presenting the story. In turn, because the story conveys the gift from God to humankind, it naturally comes before an exhortatory section on an individual's gift to God. See, e.g., Anthony Smith, "What Do you Give God For Christmas?," http://www.christian-momies.com/special-

features/bible-studies/what-do-you-give-god-for-christmas/ ("[t]he first Christmas gift was given by God to us, so what do we give Him? . . . yourself"). Further, the characters of the Nativity story are stock; the story requires angels, Mary, Joseph, the infant Jesus, shepherds, and wise men. Thus, such characters appear in both parties' works and operate within a relatively defined sequence and relationship, as defined by the Bible. In other words, the organization of ideas in CIC is one of the finite ways to instruct families on using a Nativity story with figures. See Rice v. Fox Broad. Co., 330 F.3d 1170, 1177 (9th Cir. 2003).

Likewise, the expression of the directions in CIC merges with the concept of providing instructions for using an interactive Nativity book and figures, such that they are not protectible. See Allen v. Academic Games League of Am., Inc., 89 F.3d 614, 617-18 (9th Cir. 1996). Lastly, the placement of the theme as the last event in each work is unprotectible because it flows naturally from the story itself. As discussed above, each work must first tell the Nativity story in order to set up the idea of an individual's gift to God. Thus, the allegedly similar manner[3] in which the theme and message are communicated is not protectible. See Olson,

---

[3] Additionally, the theme of giving one's self to God as a Christmas gift does not, in fact, appear in the same manner. In CIC, that idea is not mentioned until the last sentence of the last day's reading. Conversely, this theme is far more central to defendants' work; WGWC introduces the theme in its title and again in its very first and each subsequent poem, before elaborating thereon in its final sections.

Page 17 - OPINION AND ORDER

466 F. Supp. 2d at 1237.

In sum, the substantial similarities alleged by plaintiff are not actionable either individually or when taken together. The theme of giving one's self to God for Christmas is not only too general to be protected but is also a standard topic in both children's and biblical literature. As part of the public domain, the Nativity story and/or the characters therein are also unprotectible. While CIC and WGWC share several underlying religious concepts, neither the instructions, the questions, nor the sequencing of these elements is protectible. Moreover, the directions and the questions are distinctly arranged and formatted, and the questions entail a strikingly different line of inquiry. In other words, presenting devotional exercises based on the Advent tradition of unwrapping gifts in the days leading up to Christmas is both unoriginal and not tied to a particular expression.

Once these nonprotectible elements are disregarded, however, there is little left for this Court to evaluate. The scope of plaintiff's copyright is thin, "which means that it only protects the copyrighted work from virtually identical copying." Erickson, 839 F.Supp.2d at 1138. While the Court acknowledges defendants had access to CIC prior to publishing WGWC, there is no argument or evidence indicating that any remaining similarities are virtually identical. See generally Pl.'s Resp. to Mot. Dismiss; FAC Exs. A & B. In any event, an independent comparison of the works reveals

Page 18 - OPINION AND ORDER

several differences. For instance, CIC and WGWC employ distinct literary mechanisms: plaintiff's work is told in the third person with no dialogue and an instructional tone, whereas defendants' work, written in the first person, is relayed in a fanciful tone via rhyming poems. Compare FAC Ex. A, with id. at Ex. B. As such, plaintiff's copyright infringement claim fails as a matter of law. Therefore, defendants' motion is granted.

## CONCLUSION

Defendants' motion to dismiss (doc. 16) is GRANTED. This case is DISMISSED.

IT IS SO ORDERED.

Dated this 23RD day of October 2013.

_____
Ann Aiken
United States District Judge